UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 19 CR 623 |
| ) | Hon. Robert W. Gettleman |
| THOMAS E. CULLERTON ) | |
| ) | |

# GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANT'S PRE-TRIAL MOTIONS

The UNITED STATES OF AMERICA, by JOHN LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby responds to defendant's pre-trial motions. In support of this response, the government represents as follows:

## BACKGROUND

On August 1, 2019, a grand jury in this district returned a forty-one count indictment charging Thomas Cullerton with conspiring to commit an offense against the United States, in violation of Title 18, United States Code, Section 371 (Count One), embezzlement of the assets of a labor organization, in violation of Title 29, United States Code, Section 501(c) (Counts Two through Forty), and concealing a material fact in connection with the delivery of and payment for health care benefits, in violation of Title 18, United States Code, Section 1035 (Count Forty-One).  R. 1.

The government anticipates that the evidence at trial will show that the defendant was a ghost payroller—an individual who, while denominated as a full-time employee at the union—effectively hardly ever showed up for work.  Specifically, the government anticipates the evidence will show that on or about March 1, 2013—several weeks after

he was sworn into office as an Illinois State Senator—Thomas Cullerton was put on the payroll of the Teamsters Joint Council 25, an umbrella organization that represents the interests of approximately 100,000 Teamsters union members in the Chicagoland area. He remained on the payroll for almost three years. During that time, he collected approximately $188,320 in salary, allowances, and bonuses, and the Teamsters made monthly pension and health and welfare benefit payments totaling approximately $64,068. Cullerton and his family also made medical claims resulting in approximately $21,678 in payouts from a union healthcare plan. Cullerton used the salary he was paid for personal expenses.

Although Cullerton received benefits exceeding $200,000, he was a virtual no-show at work over the course of three years. For example, multiple union employees in supervisory positions are expected to testify at trial that, after Cullerton was hired as an organizer, they attempted to assign him work, but the defendant was invariably unavailable to work. Tellingly, one of the union supervisors did not even realize that the defendant had remained on the payroll over the course of three years. Another high-level official at the union is expected to testify that Cullerton "blew off" efforts to contact him to perform work, and this official was told by Cullerton to "talk with his secretary to schedule union events on his calendar." This high-level official repeatedly raised the fact that Cullerton "never showed up for work" out of concern for the liability the union could face. Several other organizers are expected to testify about Cullerton's general absence

from day-to-day work activities at the union, and explain their limited interaction with him compared to other organizers.

The government expects there to be substantial corroboration for their testimony. For example, the government expects to introduce union records that were used during the time the defendant was on the payroll to track the work organizers performed. Between 2013 and his termination in 2016, there are limited references to Cullerton performing any work, which occurred primarily for an isolated period of time in 2014. With respect to Counts Two through Forty, which charge the defendant with money received each pay period within the 2015 through 2016 timeframe—the final year he was on the union payroll—the government expects this and other evidence to show that, as to the overwhelming majority of these pay periods, the defendant performed no work at all. In addition, the government expects to introduce records reflecting that, while the vacation time of other organizers and employees who worked for Teamsters Joint Council 25 was tracked internally, no effort was made to track the defendant's use of vacation time. The reason will be easy for the jury to appreciate: as a ghost worker, he effectively was on a permanent vacation.

Individual A is also expected to confirm that Cullerton did very little to no work over the three years he was on the payroll, and that Individual A could not recall Cullerton doing anything of value for the Teamsters. Individual A is further expected to testify that he ordered Cullerton be fired because Individual A was afraid that word

would get out that Cullerton was a ghost payroller, and Individual A was afraid of getting in trouble in the event that fact was discovered by union investigators.[1]

The government's evidence is also expected to show that a number of records were falsified to make it appear that the defendant was a full-time worker at the union, and that the defendant himself submitted false records, including statements of economic interests to the Illinois Secretary of State, that either mischaracterized or failed to reveal his receipt of payments from the union.

The government has provided the defendant with ample discovery and has disclosed the witness statements and other evidence discussed above well in advance of the defendant's filing of his pretrial motions. The defendant now argues, among other things, that virtually all of the charges against him should be dismissed because he was not on fair notice that acting as a ghost employee for a union would expose him to criminal liability.

## ARGUMENT

I. **Defendant's Motion to Dismiss Counts One through Forty for Failure to Charge an Offense and for Vagueness Should Be Denied.**

The defendant argues that Count One through Forty of the indictment should be dismissed because each count fails to charge an offense or, in the alternative, the statutes

---

1     The foregoing makes clear that there is more to Individual A's statements than those referenced in the defendant's motion. The defendant cites Individual A's grand jury testimony, but fails to point out that Individual A understood from the start that Cullerton was seeking to be hired as a ghost payroller, and that while he gave instructions for Cullerton to do enough simply to make it "appear that he was doing some work"—in other words, to provide cover for this sham arrangement—Individual A understood Cullerton did very little to no work over three years, and it was wrong to continue to pay him.

4

in question are constitutionally void for vagueness. For the reasons discussed below, this motion should be denied.

### A. Counts One through Forty Each Charge an Offense.

#### 1. Applicable Law

For an indictment to be legally sufficient, it must (1) state each of the elements of the crime charged; (2) provide adequate notice of the nature of the charges so that the accused may prepare a defense; and (3) it must allow the defendant to raise the judgment as a bar to future prosecutions for the same offense. *United States v. Fassnacht*, 332 F.3d 440, 444-45 (7th Cir. 2003) (citations omitted). When reviewing the sufficiency of an indictment, a court looks at the charge at its entirety, rather than in a hyper-technical matter. *Id.* at 445. So long as the charge provides some means of pinning down the specific conduct at issue, the presence or absence of any particular fact is not dispositive. *Id.* Generally speaking, an indictment that tracks the words of the statute generally meets the requirement that it state each element of the offense, so long as the statute sets forth the elements. *Id.*

#### 2. Analysis

Counts One through Forty properly charge federal offenses. With respect to Count One, Title 18, United States Code, Section 371 provides in pertinent part as follows:

> If two or more persons conspire . . . to commit any offense against the United States . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be

> fined under this title or imprisoned not more than five years, or both.

Count One faithfully states each element of this offense as it appears in the statute. It alleges that (1) defendant Cullerton knowingly conspired with Individual A and others known and unknown to violate 29 U.S.C. § 501(c) and 18 U.S.C. § 664. R. 1 at 5-6. Moreover, the indictment also explains the nature of the conspiracy in great detail, by alleging, among other things, that: (i) the defendant received salary payments, allowances, bonuses, and other benefits even though the defendant did little or no work for Teamsters Joint Council 25 over the course of three years, *id.* at 7; (ii) documents were created by the union that made it falsely appear that Cullerton was working full-time, *id.*; and (iii) the defendant submitted false statements of economic interest to the Illinois Secretary of State that made it appear that he was legitimately employed as an organizer for Teamsters Joint Council 25, when in fact he was not, and at times failed to disclose his income from the union. *Id.* at 8-9. Furthermore, the indictment lists multiple overt acts alleged to have been taken in furtherance of the conspiracy, including but not limited to Cullerton's submission of false statements of economic interests to the Secretary of State that omitted reference to the funds the defendant received from Teamsters Joint Council 25. R. 10-11. This detailed recitation of the nature of the conspiracy clearly provides the defendant with the requisite notice of the charges to enable him to mount a defense. *Fassnacht*, 332 F.3d at 444-45.

With respect to Counts Two through Forty, 29 U.S.C. § 501(c) provides as follows:

> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

Counts Two through Forty track this language by alleging that the defendant "did embezzle, steal, and unlawfully and willfully abstract and convert to his own use, the moneys, funds, property, and other assets of a labor organization, namely, Teamsters Joint Council 25, by which he was employed," and goes on to provide the date and the amount embezzled on each specified date, which corresponds to payments he received from the union over roughly the last year he was on the payroll. R. 12-14.

Despite this, the defendant argues that these charges fail to state an offense because the indictment is, as the defendant sees it, "silent" on the question of whether the defendant acted with fraudulent intent. R. 69 at 5. Not so. As an initial matter, the defendant glosses over the fact that Count One charges a conspiracy to violate other federal statutes; it does not require the government to allege the completion of the substantive crimes or the satisfaction of the elements of the underling offenses; nor is there a requirement that a particular member of the conspiracy commit each element of the offense. *E.g.*, *Ocasio v. United States*, 136 S. Ct. 1423, 1429-30 (2016); *United States v. Jackson*, 33 F.3d 866, 870-71 (7th Cir. 1994); *United States v. Kahn*, 381 F.2d 824, 829 (7th Cir. 1967) (citing *Wong Tai v. United States*, 273 U.S. 77, 81 (1927)).

7

Yet even if all of this were somehow required, Count One clearly spells out that the conspiracy involved embezzlement, stealing, and unlawfully and willfully converting property—and clearly explains in detail how the conspirators, including the defendant, used "false pretenses," falsified documentation, and false statements in official filings, R. 1 at 6-8, further driving home the point that the defendant possessed the requisite fraudulent intent to obtain benefits even though the defendant did little or no work in return for these benefits. Moreover, all counts the defendant challenges allege that the defendant embezzled, stole and unlawfully and willfully converted union property. Where an indictment alleges that the defendant did "embezzle, steal, and unlawfully and willfully abstract and convert," it adequately alleges the defendant's fraudulent intent for purposes of section 501(c). *United States v. Duff*, 529 F. Supp. 148, 153 (N.D. Ill. 1981) (rejecting similar argument to the one presented here) (citing *United States v. Willis*, 515 F.2d 798, 799-800 (7th Cir. 1975) (the word "embezzle" connotes to both lawyers and laymen that the act was performed with wrongful intent) and *United States v. Minick*, 636 F.2d 181, 184 (7th Cir. 1980) (the term "convert" implies "some kind of willful purpose and wrongful intent in the taking of property not belonging to the converter")).[2] *See also United States v. Alexander*, 415 F.2d 1352, 1357-58 (7th Cir. 1969) (the very definition of embezzlement is "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come"); *United States v.*

---

2    The Seventh Circuit has cited the *Duff* decision with approval in deciding that union authorization of an expenditure was not dispositive on the issue of whether fraudulent intent existed; in this Circuit, a totality of the circumstances test is used to assess the existence of fraudulent intent. *United States v. Floyd*, 882 F.2d 235, 240 (7th Cir. 1989).

*Hummer*, 322 F. Supp. 601, 602 (N.D. Ill. 1971) (inclusion of term embezzlement in indictment implicitly includes wrongful or felonious intent). Nothing more is required. Accordingly, the defendant's argument that Counts One through Forty fail to state an offense is meritless.

### B. The Charges in Counts One through Forty are Not Unconstitutionally Vague as Applied.

#### 1. Applicable Law

The void-for-vagueness doctrine, derived from the Due Process Clause, *see* U.S. Const., amend. V, provides that a penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). A criminal statute violates the Fifth Amendment's guarantee of due process of law if it is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).

#### 2. Analysis

Count One alleges a violation of the general conspiracy statute, 18 U.S.C. § 371, which in plain language makes it a criminal offense to conspire to commit any offense against the United States and to take an overt act in pursuit of that offense. There is nothing imprecise or difficult to understand about this language; if one conspires to violate a law of the United States and a conspirator takes an overt act or causes an overt act to be taken in furtherance of the conspiracy, liability attaches. Perhaps

9

unsurprisingly, the defendant cites no court opinion holding the general conspiracy statute to be unconstitutionally vague, even though it has been a part of the law of the United States (including in a prior statute before it was recodified as § 371) for more than one hundred years, and has been subject to prior constitutional challenges. *See generally Haas v. Henkel*, 216 U.S. 462, 253-54 (1910) (rejecting constitutional challenge to defraud clause of statute now codified as § 371, and noting the statute is "plain and broad").

Insofar as the defendant argues that the statutes that are the object of the conspiracy are vague, he is wrong on that ground as well. Section 501(c) was enacted as a part of the Labor-Management Reporting and Disclosure Act of 1959 (the "LMRDA"). The LMRDA was the culmination of several multi-year Congressional investigations into criminal and other corrupt activities surrounding organized labor, including investigations spearheaded by Robert F. Kennedy, the then-chief counsel of the Senate's Select Committee on Improper Activities in Labor and Management, also known as the McClellan Committee. *See* James B. Jacobs & Ellen Peters, "Labor Racketeering: The Mafia and the Unions," *Crime and Justice*, vol. 30 (University of Chicago Press 2003) at 229-237. These investigations uncovered a variety of abuses, including corruption, the infiltration of unions by organized crime, skimming of union funds, and embezzlement, including instances where "union employees secured positions as employees of benefit plans while doing little work for high fees." *Id.*[3] The LMRDA was therefore

---

[3] One Senate investigation preceding the passage of the LMRDA focused on abuses in relation to

specifically designed to address "a number of instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standings of responsibility and ethical conduct" within labor organizations. Labor-Management Reporting and Disclosure Act of 1959, § 2(b). Indeed, as the Third Circuit has explained, "[t]he prohibition against the embezzlement of union funds under section 501(c) is designed to create a broad prohibition on pilfering union funds and punish unconventional chicanery by reaching novel schemes and closing the gaps and crevices from which other statutes had allowed guilty men to escape through the breaches." *United States v. Dressel*, 625 Fed. Appx. 583, 586-87 (3d Cir. 2015) (citing *United States v. Lore*, 430 F.3d 190, 200, 202–03 (3d Cir. 2005) (quoting *United States v. Silverman*, 430 F.2d 106, 126–27 (2d Cir. 1970)) (cleaned up). *See also McNamara v. Johnson*, 522 F.2d 1157, 1163 (7th Cir. 1975) (noting LMRDA was response to "official pilfering, union violence and the use of union office for personal profit," and was intended to "expose conflicts of interest and stamp out embezzlement and self-dealing by union officials")

---

insurance and pension plans and reported "many instances were found in which liberal service fees were paid not only to agents and policyholders but also to other persons who performed little or no service. . . . Testimony before the subcommittee revealed many instances in which agents received unduly high service fees under circumstances that raise grave doubts as to the extent to which they were earned." S. Rep. 84-1734, at 32 (1956) (Welfare and Pension Plans Investigation, Final Report of the Committee on Labor and Public Welfare). A number of the cited examples involved malfeasance involving union officials. *See, e.g., id.* at 46 ("Various other officials and persons connected with local unions also received salaries as welfare representatives. Inasmuch as the fund directly administered all claims and benefits payments, it was not clear just what functions of value these welfare representatives performed for the payments they received."). As a result of these and other abuses, the Committee, headed by Illinois Senator Paul Douglas, recommended enacting legislation that penalized any person who "steals, unlawfully and willfully abstracts or converts to his own use or to the use of another, or embezzles any of the moneys, funds, securities, premiums, credits, property, or assets of any plan or fund . . . ." *Id.* at 76. As noted below, a substantially similar provision was ultimately enacted as § 664. Pub.L. 87-420, § 17(a), Mar. 20, 1962, 76 Stat. 41.

11

(citing Cox, "Internal Affairs of Labor Unions Under the Labor Reform Act of 1959," 58 Mich. L. Rev. 819 (1960)).

Given the purpose of section 501(c) as described above, it is no surprise that this statute has been used in similar circumstances such as this, namely, to prosecute those who divert union funds to subsidize no-show jobs. For example, in *United States v. Bane*, 583 F.2d 832, 834 (6th Cir. 1978), the defendant was the president of a Teamsters local union. Defendant Bane obtained a subsidy from Jimmy Hoffa, then the International President of the Teamsters, to hire an organizer, namely, William Hoffa, who was Jimmy Hoffa's brother. *Id.* Bane and William Hoffa were indicted under 501(c) based on William Hoffa's employment as a ghost who did no organizing work for the local union. *Id.* The Sixth Circuit noted that, in enacting section 501(c), Congress imposed the "broadest possible fiduciary duty upon union officers and employees," and that the award of a no-show job "clearly comes within the statute's coverage" of any "person who embezzles . . . abstracts . . . or converts . . . money . . . of a labor organization." 583 F.2d at 834-35. This case is on all fours with *Bane*. Cullerton was an employee that fleeced the union out of more than $200,000, and as such he was on clear notice that, as an employee, he faced liability for embezzling union funds.[4]

The foregoing discussion applies with equal force to the text of 18 U.S.C. § 664, which has language that is substantially similar to that of § 501, except that the victims

---

4   This statute has also been previously been used in this district to address ghost payrolling. *See United States v. Matassa*, No. 17 CR 373 (N.D. Ill.) (Kennelly, J.) (defendant, an officer of a local union, charged with and pled guilty to violating § 501(c) for his role in placing his spouse, who performed no work for the union, on the union payroll).

of the embezzlement are identified as the union benefit plans.  R. 1 at 5-6.  Section 664 was a new offense that was included as part of the Welfare and Pension Plans Disclosure Act Amendments of 1962, Pub.L. 87-420, signed into law by President Kennedy in the wake of the legislative inquiries referenced above that uncovered various abuses and embezzlement schemes.  *See* G. Robert Blakey, *Welfare and Pension Plans Disclosure Act Amendments of 1962*, 38 Notre Dame L. 263, 263-64 (1962-1963) [hereinafter referred to as "Blakey"].  As noted above, text substantially similar to that found in § 664 was initially proposed by Senator Douglas and others to be a part of the same package of legislation that included § 501.  *Id.* at 282-83.

Though he argues that § 501(c) and § 664 are unconstitutionally vague, the defendant fails to cite a single case supporting his contention—despite the fact that both statutes were enacted roughly sixty years ago and were clearly intended to embrace precisely the type of conduct charged in the indictment in this case.  Moreover, substantive violations of § 501(c) and § 664, by prohibiting embezzlement, stealing and wrongful conversion, carry with them a requirement that the government prove fraudulent intent under the totality of the circumstances.  *Floyd*, 882 F.2d at 240; *Duff*, 529 F. Supp. at 152-53 (noting fraudulent intent, a cornerstone of 501(c) offenses, is adequately alleged through use of statutory terms embezzle, steal, and unlawfully and willfully abstract and convert).  The inclusion of a scienter requirement such as the one applicable to these statutes has long been understood to alleviate vagueness concerns. *See McFadden v. United States*, 576 U.S. 186, 197 (2015); *Gonzales v. Carhart*, 550 U.S.

124, 149 (2007). *See also* Blakey at 283 (there was "little danger" of an "otherwise innocent transaction being caught up" by § 664, "since it is clear that wrongful intention would be held to be the core of the crime"). The defendant's argument that he was not on fair notice that the statutes prohibited the charged conduct is simply unconvincing.

Finally, the defendant suggests that the statutes as applied did not provide him with fair notice and invite arbitrary enforcement because, so far as he sees it, his conduct amounts to nothing more than failing to live up to the expectations of his supervisors by being "inattentive." R. 69 at 6. As discussed above, this case at bottom is one involving a ghost payroller—an individual who occupied a low-show, indeed, a mostly no-show, job over the course of three years. As discussed earlier, with respect to Counts Two through Forty, which charge embezzlement of union funds for the period from January 2015 to January 2016, the government expects the evidence to show that, as to the vast majority of these counts (which include benefits the defendant received as to distinct pay periods during this time frame), the defendant performed no work at all. The defendant cannot escape the reach of the statute simply by restyling the nature of his conduct, and then arguing he was not on fair notice that this conduct was criminal. The motion should be denied.

## II. Defendant's Motion to Compel Early Filing of *Santiago* Proffer Should Be Granted in Part and Denied in Part.

The defendant has been provided with voluminous early discovery in this case, including prior statements of the witnesses the government expects to call at trial. Indeed, defense counsel has had all of this discovery for many months, thereby affording defense counsel an extraordinarily long period of time to review and digest the material provided. There is little mystery as to what evidence the government intends to rely upon in proving its case at trial.

Under these circumstances, the defendant's request that a *Santiago* proffer be filed 60 days prior to trial is unnecessary. In this district, *Santiago* proffers are often submitted two weeks prior to trial, including in cases that are far more complicated than this one. *See United States v. Dean*, No. 09 CR 446, 2010 WL 706038, at *1 (N.D. Ill. Feb. 24, 2010) (Der-Yeghiayan, J.) (two weeks' notice relating to *Santiago* proffer is sufficient under the facts of the case) *United States v. Sharp*, No. 04 CR 797, 2005 WL 2124488, at *1 (N.D. Ill. June 8, 2005) (Moran, J.) (ordering *Santiago* proffer to be filed two weeks prior to trial); United *States v. Carlisi*, No. 92 CR 1064, 1993 WL 339079 at *6 (N.D. Ill. Aug. 30, 1993) (Plunkett, J.) (*Santiago* proffer filed two weeks prior to trial in Outfit racketeering case involving eleven defendants "more than adequate given the circumstances of this case"). This case is not unusually complicated or complex as there is only one defendant and the facts are straightforward. Accordingly, there is no cause to require so early a filing of a *Santiago* proffer—particularly where the defendant already has relevant witness statements in his possession. The motion should be

15

granted and denied in part, with a date set for submission of the proffer two weeks prior to trial, instead of 60 days.

### III. Defendants's Motion for Production of 404(b) Material Should Be Granted in Part and Denied in Part.

The defendant asks the Court for the government to produce material pursuant to Fed. R. Evid. 404(b) at least 60 days prior to trial. Fed. R. Evid. 404(b) requires the government to "provide reasonable notice in advance of trial . . . of the general nature of any such evidence it intends to introduce at trial." The government acknowledges its obligation to give reasonable notice, and in a letter to defense counsel the government agreed to provide the defendant with identification and notification of evidence it intends to introduce pursuant to Rule 404(b) two weeks prior to trial, and that is a sufficient amount of time. Such advance notice comports with the rule's "reasonable notice" requirement. *See United States v. Blount*, 502 F.3d 674 (7th Cir. 2007) (one-week notice sufficient; noting other courts finding 48 hours to several days sufficient)*; United States v. Burns*, No. 07 CR 56, 2008 WL 4542990, at *2 (N.D. Ill. Apr. 29, 2008) (Gottschall, J.) (rejecting request for 404(b) evidence to be provided 45 days prior to trial; two weeks deemed sufficient); *United States v. Myrick*, No. 97-197, 1997 WL 564673, at *2 (N.D. Ill. Sept. 3, 1997) (Andersen, J.) (two-week notice sufficient); *United States v. Dean,* No. 09 CR 446, 2010 WL 7060386, at *1 (N.D. Ill. Feb. 24, 2010) (Der-Yeghiayan, J.) (same); *United States v. Gary*, No. 06 CR 631, 2007 WL 257639, at *5 (N.D. Ill. Jan. 25, 2007) (Kendall, J.) (same). The defendant cites no special reason in this case that calls for any special rule of disclosure; rather, the defendant simply makes a one paragraph boilerplate

request for 404(b) material. Accordingly, the government respectfully requests that the motion be granted in part and denied in part, and that the government be ordered to supply 404(b) notice two weeks prior to trial.

To the extent that the defendant seeks disclosure of extensive details concerning any 404(b) evidence, this request is contrary to the language of the rule, which merely requires notice of "the general nature of any such evidence," and should therefore be denied. *See e.g.*, *Dean*, 2010 WL 706038, at *1; *Burns*, 2008 WL 4542990, at *2; *United States v. Stoekcer*, 920 F. Supp. 876, 882-83 (N.D. Ill. 1996); *United States v. Alex*, 791 F. Supp. 723, 728 (N.D. Ill. 1992). Even an indictment requires no such detail to effectively put a defendant on notice of the offenses charged. *See United States v. Kendall*, 665 F.2d 126, 135 (7th Cir. 1981). Greater disclosure is unnecessary with respect to evidence of acts that do not form the basis of the charge. The proviso that the government need only provide information concerning the *general nature* of any other-acts evidence it intends to use was not accidental. The Senate Judiciary Committee, which formulated the 1991 amendments to Rule 404(b), "considered and rejected a requirement that the notice satisfy the particularity requirements normally required of language used in a charging instrument . . . . Instead, the Committee opted for a generalized notice provision . . . ." Note of Advisory Committee, reprinted in Federal Criminal Code and Rules.

WHEREFORE, the government respectfully requests that the Court enter an order (i) disposing of the defendant's pretrial motions in the manner set forth herein; and (ii) granting the government such other and further relief as may be just and proper.

    Respectfully submitted.

    JOHN R. LAUSCH, JR.
    United States Attorney

By: /s/ Amarjeet S. Bhachu
    AMARJEET S. BHACHU
    ERIKA L. CSICSILA
    Assistant United States Attorneys
    219 South Dearborn Street
    Fifth Floor
    Chicago, Illinois 60604
    (312) 469-6212